# EXHIBIT A

E-Filed
09/11/2014 @ 11:56:21 AM
Honorable Julia Jordan Weller
Clerk Of The Court

## IN THE SUPREME COURT OF ALABAMA

EX PARTE GREGORY HUNT        )

                            )

In re: State of Alabama,        )

                            )

     Petitioner,           )

                            )

v.                           ) No. _____

                            )

Gregory Hunt,           )

                            )

     Respondent.          )

### STATE OF ALABAMA'S MOTION TO SET AN EXECUTION DATE

Pursuant to Rule 8(d)(1) of the Alabama Rules of Appellate Procedure, the State of Alabama respectfully requests that this Honorable Court set an execution date for carrying out Gregory Hunt's duly-adjudicated sentence of death. In support of its motion, the State asserts the following:

Gregory Hunt currently resides on Alabama's death row, where he has spent the last twenty-four years. As described below, Hunt murdered Karen Lane in August of 1988. As a result of this murder, Hunt was convicted of two counts of murder during sexual abuse in violation of Ala. Code, §13A-5-40(a)(8), and one count of murder during a burglary in violation of Ala. Code, §13A-5-40(a)(4). Hunt was subsequently sentenced to



death.  Because Hunt has exhausted all three layers of

appellate review (direct appeal, Rule 32, and federal

habeas), the State now seeks execution of Hunt's duly-

adjudicated death sentence.

I.   The Alabama Department of Corrections has adopted
     an amended protocol that is virtually identical to
     Florida's newly-revised protocol which has been
     ruled constitutional.

As an initial matter, the Alabama Department of

Corrections recently amended its protocol which was

adopted on September 10, 2014.  This protocol calls for

the sequential administration of three FDA-approved

drugs: (1) 500 milligrams of midazolam hydrochloride,

which is meant to serve as an anesthetic; (2) 600

milligrams of rocuronium bromide, a neuromuscular

blocking agent that paralyzes voluntary muscles,

including the diaphragm, and stops respiration; and (3)

240 milliequivalents of potassium chloride, a naturally

occurring salt that induces cardiac arrest by

interfering with the heart's electrical activity.

Alabama's amended protocol is virtually identical to

Florida's,[1] which has been used to execute seven

inmates in 2014.[2]  See Execution List 2014, Death

Penalty Info. Center, http://www.deathpenaltyinfo.org/

execution-list-2014 (last visited September 11, 2014).

Numerous courts have examined Florida's protocol

and held it to be constitutional.  The Florida Supreme

Court recently addressed a legal challenge concerning

the use of midazolam as the first drug in a three-drug

protocol and found that it did not violate the Eighth

Amendment.  Howell v. State, 133 So. 3d 511, 521-522

(Fla. 2014), cert. denied, 134 S. Ct. 1376 (2014).  In

particular, the Florida Supreme Court agreed with the

lower court's finding "that the 500 milligram dose of

midazolam is sufficient to render the condemned

defendant both unconscious and insensate prior to

administration of the second and third drug."  Id. at

---

[1] Florida's protocol substitutes vecuronium bromide for rocuronium
bromide.  Both are neuromuscular non-depolarizing agents, a form of
neuromuscular blocker, as was pancuronium bromide, for which rocuronium
is now being substituted.  In July 2012, rocuronium was adopted in
Virginia's execution protocol in lieu of pancuronium, which was then in
short supply.  See, e.g., "Virginia Adds New Lethal Injection Drug:
Rocuronium Bromide."  CBSDC (July 27, 2012, 7:24 PM),
http://washington.cbslocal.com/2012/07/27/virginia-adds-new-lethal-
injection-drug-rocuronium-bromide.
[2] The amended protocol is different from the two-drug protocols used in
Arizona, Kentucky, Louisiana, and Ohio, which call for midazolam and
hydromorphone, and from the three-drug protocol used in Oklahoma, which
only requires 100 milligrams of midazolam hydrochloride.

3

521.   Howell was executed without incident on February
26, 2014.   The Eleventh Circuit also rejected a recent
challenge to Florida's new protocol.   Chavez v. Florida
SP Warden, 742 F.3d 1267, 1272-1273 (11th Cir. 2014).
In ruling that Florida's protocol was constitutional,
the Chavez court stated:

> Chavez has not established a substantial
> likelihood of success on the merits of his
> Eighth Amendment claim that the use of
> midazolam hydrochloride in Florida's current
> lethal injection protocol amounts to cruel and
> unusual punishment.   In light of the district
> court's thorough and detailed credibility
> determinations and the extensive factual
> findings that flowed from them, including the
> court's finding that the "massive dose [of
> midazolam] required by the Florida protocol …
> will render the individual insensate to
> noxious stimuli by placing the individual in
> an anesthetic state, unable to discern pain,"
> Chavez has not demonstrated that the use of
> midazolam in the 2013 Protocol creates a
> substantial risk of serious harm.   The
> district court's findings, none of which are
> clearly erroneous, negate any contention that
> Chavez's evidence shows that midazolam is not
> effective as an anesthetic.

Id. at 1272.   The United States Supreme Court denied
certiorari, Chavez v. Palmer, 134 S. Ct. 1156 (2014),
and Chavez was executed without incident on February
12, 2014.

4

In conclusion, this Court should follow the well-reasoned holdings of the Florida Supreme Court and the Eleventh Circuit Court of Appeals and set an execution date for Hunt.

## II.  The procedural history indicates that Hunt has fully exhausted his appeals.

### A.    Facts of the Crime

There is no doubt that Hunt committed the murder here, and it was as brutal as they come.  Hunt had been dating the victim, Karen Lane, for about one month before he killed her.  At the time of her death, Lane was living in an apartment with Tina Gilliland in Cordova, Alabama.  Shortly after 6 p.m. on August 1, 1988, Gilliland and Lane left the apartment in Gilliland's 1986 beige Yugo and drove to Gilliland's fiance's residence in Parrish, Alabama.  When they arrived, they saw Hunt's van outside.  Gilliland got out of her car and went inside the house, while Lane left in Gilliland's Yugo.  Hunt had seen Lane in the car and asked Gilliland where Lane was going. Gilliland told Hunt that Lane was going to her mother's house.  Hunt then left the house.  Between midnight and 12:30 a.m., Amy Sheree Long testified that she was

standing in a bank parking lot in Cordova and "saw Hunt
in his van chasing Lane in a beige Yugo at a high
speed."

Shortly before 2 a.m. on August 2, 1988, Mary
Turner, who lived in the same apartment complex with
Lane and Gilliland heard a noise that sounded like
glass breaking.  She looked outside and saw Hunt reach
his hand into the window of Lane and Gilliland's
apartment and enter through the adjacent door.  After
Hunt entered the apartment, Turner heard "peculiar
noises."  She described the first noise as follows:
"like somebody had hit real hard, hit the floor," and a
second noise "like somebody sitting in a chair and just
sliding it across the floor."  Around 2 a.m., Turner
heard Lane and Gilliland's apartment door slam and saw
Hunt leaving the apartment.  At 2:44 a.m., Hunt called
Gilliland's fiancé, Clinton Cook, from Lane's apartment
and told him that Lane was lying in the kitchen floor
and asked him "to get somebody up [t]here to get her to
the hospital."

Lane's body was found in the apartment later that
morning.  She had sustained sixty injuries including

twenty injuries to her head, such as "lacerations, external bruises, bruises to the brain, fractured cheekbones, and nasal bones broken into small pieces." In addition, she had twelve fractured ribs on each side of her body and a fractured breastbone. "Her heart and lungs were bruised, as was her pancreas, and she had a three-quarter-inch tear in her aorta and three tears in her liver." There were also numerous bruises and lacerations on her arms, legs, chest, back, and on her neck muscles. Moreover, there was semen in the victim's mouth. According to a serologist with the Alabama Department of Forensic Sciences, the quantity and condition of the sperm found in Lane's mouth indicates that the semen was deposited "very close ... to the time of death" and no more than an hour before, "if not postmortem." A broomstick found between Lane's legs contained mucus secretions which could have come from the victim's vagina.

In the hours before Lane's death, Hunt made numerous incriminating statements. On the afternoon of August 1, 1988, Hunt told Shirley Romine that "he was tired of everything and that he was moving back to

Miami, Florida." He also said, "She makes me so mad I could kill that [b]itch." Between 8 and 8:30 p.m., Hunt told James Mullinax that "he was going to have to do something about the problem." He also told Mullinax and Hortencia Ovalle when he left their house that he was going to "fuck somebody up." Around 9:40 p.m., after asking Gilliland where Lane was, he warned her that he "know[s] how you women are. You better tell me where she's at." After Gilliland responded that she did not know where Lane was, Hunt once again warned her to tell him where Lane was or it "was going to be detrimental to [Gilliland]." Hunt also told Gilliland that he was ready to go back to prison if that was what it took.

After 11:00 p.m., Hunt was with Deborah Twilley. Hunt told Twilley that he was tired of Lane's crap. He also admitted burning Lane's house although he was not sure whether it had burned to the ground but he hoped that it had. Finally, Hunt told Twilley that he burned Lane's house because he was "just tired of everything." A little while later Hunt called Clinton Cook and told him that Lane and her family were going to be upset

8

with him because he had done something "materialistically."  He also told Cook that "people didn't screw him over like this and get away with it."  Hunt called Lane's mother around 1:00 a.m. and told her that all he wanted to do was talk to Lane but she would not stop.  He also threatened violence against Gilliland.  Finally, between 7:00 and 8:00 p.m. the next night, Hunt called his brother-in-law and told him that he had been out partying with a woman and they got into a fight.  Hunt told his brother-in-law that he did not think he had killed her but that he was not sure how she was when he left her and that he had "checked with the hospitals and newspapers and I can't find anything else out about her at all."

The police found a bloody palm print at the crime scene that belonged to Hunt.  In addition, fingerprints found from the kitchen window of the apartment were matched to Hunt's right palm, right index finger, and left ring finger.[3]

---

[3] A more thorough statement of the facts can be found in the January 5, 2012 opinion of the Eleventh Circuit Court of Appeals.  Hunt v. Comm'r., Ala. Dept. of Corr., 666 F.3d 708, 710-714 (11th Cir. 2012).

## B.   Procedural History

On June 19, 1990, Hunt was convicted of three
counts of capital murder for the death of Karen Lane.
Specifically, he was found guilty of two counts of
murder during sexual abuse in violation of Ala. Code,
§13A-5-40(a)(8), and one count of murder during a
burglary in violation of Ala. Code, §13A-5-40(a)(4).
See Hunt v. State, 659 So. 2d 933, 937 (Ala. Crim. App.
1994).   Following a sentencing hearing, the jury
recommended that Hunt be sentenced to death by an 11-
to-1 vote.   On July 27, 1990, the trial court accepted
the jury's recommendation and sentenced Hunt to death.
Id.

On direct appeal, the Alabama Court of Criminal
Appeals and this Court affirmed Hunt's convictions and
death sentence.   Hunt v. State, 659 So. 2d 933 (Ala.
Crim. App. 1994), aff'd, 659 So. 2d 960 (Ala. 1995).
On October 2, 1995, the United States Supreme Court
denied Hunt's petition for writ of certiorari.   Hunt v.
Alabama, 516 U.S. 880 (1995).

Hunt filed a pro se petition for post-conviction
relief under Rule 32 of the Alabama Rules of Criminal

Procedure on February 18, 1997.  Hunt amended his
petition, with the assistance of counsel, on March 25,
2002.  The State answered Hunt's amended petition on
May 29, 2002, and asked that the trial court summarily
dismiss the amended petition.  An evidentiary hearing
was held on the amended petition on July 22, 2002.  At
the hearing, Hunt attempted to present only one
witness:  his Rule 32 attorney's legal assistant, who
was to testify concerning conversations with Hunt's
family.  The trial court excluded this testimony on
hearsay grounds.  Hunt also attempted to present
affidavits from members of his family instead of
calling them to present live testimony at the hearing.
Again, this evidence was excluded because it was
hearsay and the State was not given prior notice of
Hunt's intent to offer hearsay affidavits.  In the end,
Hunt's Rule 32 presentation consisted of a few exhibits
and his counsel's reading of the petition to the court.

On December 17, 2002, the trial court entered an
order denying the Rule 32 petition.  The Alabama Court
of Criminal Appeals affirmed the denial of the Rule 32
petition on August 25, 2005.  This Court denied Hunt's

11

petition for writ of certiorari on April 21, 2006.
Hunt v. State, 940 So. 2d 1041 (Ala. 2005).

Hunt then filed a federal habeas petition. The
district court entered a memorandum opinion and final
judgment denying the habeas petition. The Eleventh
Circuit affirmed the denial of the habeas petition.
Hunt v. Comm'r., Ala. Dept. of Corr., 666 F.3d 708
(11th Cir. 2012). The United States Supreme Court
denied Hunt's petition for writ of certiorari on
November 16, 2012.

## III. This Court should set an execution date even though Hunt may file a federal court challenge to Alabama's method of execution.

Although there are no pending challenges to the
validity of Hunt's conviction and sentence, there is a
possibility that he will file a lawsuit in federal
court challenging Alabama's method of execution. Such
a lawsuit, if filed, should not deter this Court from
setting Hunt's execution date.

The question of whether any further delay is
warranted in this case is not a state-law question
under Rule 8(d)(1) of the Alabama Rules of Appellate
Procedure, but, rather, is best determined by the

12

federal court in which Hunt may file his federal
lawsuit.  As noted by the United States Supreme Court
in Hill v. McDonough - the case that first recognized
the availability of § 1983 as a vehicle for asserting
lethal injection challenges - the equitable remedy of a
stay of execution in these cases must be balanced
against the State's "strong interest in enforcing its
criminal judgments without undue interference from the
federal courts."  126 S. Ct. 2096, 2104 (2006) (citing
Nelson v. Campbell, 541 U.S. 647, 649-650 (2004)).  The
only voice the residents of Alabama have to represent
their strong interest in enforcing the State's lawful
criminal judgments without undue interference from the
federal courts is through this Court's issuance of the
requested order setting an execution date.

Further, the federal courts are in the best
position to balance the equities in determining whether
a lethal injection challenge, if filed, warrants
further delay of Hunt's execution.  The United States
Supreme Court has held that any federal court that is
petitioned for a stay of execution so as to allow
litigation of a § 1983 lethal injection challenge must

13

balance the equities with "a strong equitable
presumption against the grant of a stay where a claim
could have been brought at such a time as to allow
consideration of the merits without requiring entry of
a stay." Id., at 2104 (citing Nelson, 541 U.S. at
650). The stay determination further turns on whether
the lawsuit is viewed as speculative, dilatory, or
abusive. Id. As the Hill Court recognized, it is the
responsibility of the federal courts to protect the
States from such abusive lawsuits. Id.

If Hunt files a civil lawsuit challenging
Alabama's method of execution, it will have no relation
to the State's lawful criminal judgment. Indeed, the
entire theory of permitting such lawsuits under § 1983
is that they do not bear on the underlying criminal
proceedings. Id., at 2096. By the Supreme Court's own
decree, the federal courts are the appropriate venues
for balancing the equities, and it is their duty to
respect any decision of this Court setting an execution
date and to protect such an order against any abusive
or dilatory suit. Hill v. McDonough, 464 F.3d 1256,
1259 (11th Cir. 2006) (quoting Hill, 126 S. Ct. at

2104).  This Court should set an execution date despite the possibility that Hunt may challenge Alabama's method of execution in federal court.

### Conclusion

~~There are currently no pending challenges to the~~ validity of Hunt's convictions and death sentence. Hunt has exhausted his direct appeal, his state post-conviction remedies, and his federal habeas corpus remedies.  As such, it is time for his sentence to be carried out.  Pursuant to Rule 8(d)(1) of the Alabama Rules of Appellate Procedure, the State requests that this Court "enter an order fixing a date of execution, not less than 30 days from the date of the order of execution."

Respectfully submitted,

Luther Strange
*Attorney General*


*s/ Beth Jackson Hughes*
Beth Jackson Hughes
*Assistant Attorney General*

15

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2014, I did serve a copy of the foregoing on the attorneys for Hunt, by placing same in United States mail, first class, postage prepaid and addressed as follows:

Anne E. Borelli
Federal Defenders, Middle District of Alabama
817 South Court Street
Montgomery, Alabama 36104

*s/ Beth Jackson Hughes*
Beth Jackson Hughes
Assistant Attorney General

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130-0152
(334) 242-7392 Office
(334) 353-3637 Fax
bhughes@ago.state.al.us

16